Filed 6/3/14  In re C.M. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re C.M., a Person Coming Under the Juvenile Court Law. | B248239 (Los Angeles County Super. Ct. No. CK97329) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> TAMMI A., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Terry T. Truong, Juvenile Court Referee.  Affirmed.

Patti L. Dikes, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Tammi A. (mother) appeals from the juvenile court's dispositional order issued pursuant to Welfare and Institutions Code section 361, subdivision (c)(1),[1] contending substantial evidence did not support removing her daughter C.M. from her custody. Mother further contends the juvenile court abused its discretion in releasing C.M. to her father Gene M. (father)[2] on the condition that he and C.M. reside with her paternal grandparents and prohibiting father from monitoring mother's visits with C.M. We conclude the juvenile court erred in relying on section 361, subdivision (c)(1) because C.M. did not reside with mother at the time the petition in this case was initiated, but the error was harmless because the juvenile court's order fell well within the discretion granted under section 361, subdivision (a)(1), the applicable provision. We also find no abuse of discretion in the other conditions set by the juvenile court. We therefore affirm.

## BACKGROUND

C.M. was born in March 2011. She lived with mother and her maternal grandmother for the first few days of her life until father and her paternal grandparents removed her from mother's care. C.M. then apparently resided with mother and father between March and May 2011, but when father was arrested for drug offenses in May 2011, father left C.M. with her paternal grandparents. The paternal grandparents filed a petition with the probate court in June 2011 for temporary legal guardianship, which was granted. That probate proceeding generated this dependency case based on a referral pursuant to Probate Code section 1513, former subdivision (c).[3] On August

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

[2] Father is not a party to the instant appeal.

[3] At the time of the referral, Probate Code section 1513, former subdivision (c) required the probate court to refer the case to the relevant social services agency for dependency investigation if there are allegations a parent is unfit. (Prob. Code, § 1513, former subd. (c), amended by Stats. 2012, ch. 638, § 14; see *In re Kaylee H.* (2012) 205 Cal.App.4th 92, 101.) If the social services agency files a section 300 petition, "the juvenile court has exclusive jurisdiction of all issues regarding custody

12, 2011, the probate court terminated the paternal grandparents' guardianship,[4] but C.M. continued to reside with her paternal grandparents, not with mother, at least through the January 15, 2013 filing of the petition in this case.

## 1. Original Petition, Detention Report, and Hearing

The Los Angeles County Department of Children and Family Services (DCFS) filed the instant petition on January 15, 2013, pursuant to section 300, subdivision (b) alleging in count b-1 that mother had a six-year history of substance abuse, currently used methamphetamine and marijuana, had used marijuana while pregnant with C.M., had tested positive for marijuana on October 24, 2012, and had been under the influence of marijuana while C.M. was in her care. In count b-2, DCFS alleged mother had mental and emotional problems, including diagnoses of depression and postpartum depression, and she had failed to take her prescribed medications. DCFS alleged mother's actions put C.M.'s physical health and safety at risk.

The detention report noted mother had been the subject of a referral in March 2011, one day after C.M. was born, alleging mother had been using marijuana and had been diagnosed with bipolar disorder but had been off her medication during her pregnancy. According to the investigation, mother admitted using marijuana and going off her bipolar medication when she found out she was pregnant, although she claimed to have restarted her medication and had an appointment with her psychiatrist in May 2011. She stated C.M. was with her father, and her paternal grandparents cared for her while father worked. Mother said father did not allow her to have unsupervised visits because there was a "post partum incident" after C.M. was born. Mother would not go into detail, but she said she had been texting father "a lot of crazy stuff." When asked, mother stated she had "no plan" for C.M. Father reported

---

and visitation of the child, and all issues and actions regarding paternity of the child." (*Kaylee H., supra*, at p. 102.)

[4] We grant the parties' joint request to take judicial notice of the docket in the probate case.

3

he had C.M. since she was two days old, and mother had sent him "mean text messages," which concerned him. When he removed C.M. from mother's home, he did so with the maternal grandmother's consent. He said he was willing and able to care for C.M. and had arranged for his parents to watch her while he worked. He wanted mother in C.M.'s life, but he thought visits needed to be supervised for now.

DCFS substantiated the allegations of neglect and that C.M. was born positive for marijuana, but it nevertheless closed the referral because C.M. appeared well cared for with father, who was protective and would not allow unsupervised visits by mother. Moreover, mother was living with the maternal grandmother at the time, who felt mother was not a threat to C.M. and did a good job caring for her.

In the June 15, 2011 guardianship petition, C.M.'s paternal grandparents also claimed mother had severe mental health issues, had been diagnosed with bipolar disorder, and did not stay on her medications. Mother also had a drug abuse history, as did father, and C.M. tested positive for marijuana at birth.

A September 20, 2012 referral based on the probate matter alleged C.M. had been the victim of emotional abuse and general neglect by mother, and general neglect by father. It noted C.M.'s paternal grandparents had initiated the guardianship action based on mother's mental health issues, failure to take her medication, and sending father text messages when C.M. was born, stating she wished C.M. was dead and she was going to harm herself by driving off the road. It noted both mother and father had a history of methamphetamine and marijuana use.

A social worker met with father, C.M., and the paternal grandparents on September 25, 2012. The social worker observed C.M. was appropriately groomed and dressed, she appeared happy and comfortable, and she was free of obvious marks or bruises. Father stated mother had mental health issues and often texted him inappropriate messages. Two days after C.M. was born, he and the paternal grandparents took C.M. from mother and the maternal grandmother. At that time, father and the paternal grandparents were going to visit C.M. when father received

4

"disturbing text messages" from mother. When they arrived to see C.M., they found mother was gone and C.M. was left with her maternal grandmother and a friend.

Following that visit, father and the paternal grandparents had C.M. in their care until May 17, 2011, when father was arrested for drug issues. After his arrest, he arranged for C.M. to live with her paternal grandparents. Father said C.M.'s maternal grandmother agreed, telling him to "get the baby out" of the environment. Father admitted he had a drug problem, but he was now drug free, claiming he had stopped using drugs over a year prior. He reported completing a "prop 36" program and continued to pay for hair follicle drug tests every 60 days to provide to the probate court. He reported living by himself, working full time, attending Narcotics Anonymous meetings, and visiting C.M. daily. He expressed concerns about mother's capability of caring for C.M. and believed C.M. was safer with her paternal grandparents. He favored the paternal grandparents being granted guardianship but expressed that he would eventually like to have custody of C.M.

The paternal grandparents reported they had ongoing concerns with mother's mental health status. The paternal grandmother cited an incident during which she invited C.M.'s maternal grandmother and mother to attend an outing to a museum, during which mother "had an outburst" and cornered the paternal grandmother in an intimidating manner. The paternal grandmother stated mother goes "back and forth" thanking the paternal grandparents for taking care of C.M. She was also unaware if mother was receiving mental health treatment or currently using drugs. The paternal grandfather and father reported mother continued to text father random inappropriate messages, such as when she wrote, "I can't wait to stick this needle in me deep . . . ." The paternal grandfather stated even after mother sent those kinds of messages she would show up for visits appearing fine. The paternal grandmother also stated mother sent text messages and made statements implying the paternal grandmother and father had inappropriate sexual relations and that the paternal grandfather was a pedophile. They stated none of those claims were true.

5

The social worker met with mother on October 2, 2012. Mother denied the allegations, but admitted she used marijuana one month prior to C.M.'s birth and C.M. was born positive for marijuana; admitted she was bipolar and did not take her medication during her pregnancy; and admitted she suffered postpartum depression after C.M. was born. She reported she had resumed taking her medication and was under the care of a psychiatrist she sees every two to four months. She admitted texting father after C.M. was born, but denied saying she wished C.M. was dead. She explained she was texting father the "horrible things" he had said to her because she had been exhausted after giving birth and father had insulted her during labor.

She further explained that, after she and C.M. had come home from the hospital, the maternal grandmother told her to get some air and leave C.M. with her, which mother did. However, she left at the time she was supposed to take C.M. to the paternal grandparents' house for a visit. She texted father to say C.M. was not with her, which she believed scared father when she did not show up at the paternal grandparents' house with C.M. She said she was just "venting." The maternal grandmother asked the paternal family for help, so father and the paternal grandparents took C.M. to their home, and she stayed there for the weekend before going to live with father. Mother also went to live with father at that time, and the paternal grandparents provided daycare while mother worked.

Mother confirmed father was arrested in May 2011 for drug-related issues, after which he refused to bring C.M. to mother and left her with the paternal grandparents, who insisted on keeping her. Mother claimed she did not have a car so C.M. remained with them. Mother eventually went to law enforcement for assistance in getting C.M. back, but they could not help her because she did not have a formal custody order for C.M. She then went to court to obtain a custody order on the same day the paternal grandparents filed the guardianship petition in probate court. She said she did not support the paternal grandparents getting guardianship because she wanted custody of C.M. and believed they were not encouraging a bond between her and C.M.

6

Mother admitted a history of drug use, claiming she "didn't use drugs until [her] mid 20's." She said "it's been months" since she used methamphetamines. She used marijuana "3 or 4 weeks ago" and produced what appeared to be a medical marijuana card set to expire in November 2012. She provided the social worker with the negative results of a hair follicle test on May 7, 2012, and a "parenting certificate" dated January 5, 2012. She indicated she wanted C.M. returned to her.

Mother tested positive for marijuana on October 24, 2012. In an October 26, 2012 "upfront assessment" by the Santa Anita Family Service, mother reported first using cocaine, cannibis, and methamphetamine at age 22 and using cannibis a week and a half prior to the assessment when she was given a medical marijuana card to help her with anxiety and depression. She denied having a substance abuse problem and did not see a need for alcohol or drug treatment. The report noted that although mother had completed an 18-month program for co-occurring disorders following a 2006 conviction for methamphetamine possession, she was minimizing her substance abuse and should be subject to random drug testing.

DCFS conducted a team decisionmaking meeting on January 10, 2013, with mother, father, the paternal grandparents, the maternal grandmother, and C.M.[5] At the meeting, mother claimed she had been "sabotaged" and the paternal grandparents wanted to keep C.M.; similarly, the maternal grandmother claimed the paternal grandparents had "plotted" against mother. Mother wanted to receive DCFS services and the maternal grandmother believed mother should receive them. Father stated he did not feel able to care for C.M. on his own and was open to DCFS services. The paternal grandparents stated, "all we care about is [C.M.]" During the meeting, mother exhibited erratic behavior by speaking loudly, twisting in her chair, and standing up in an aggressive way, all of which resulted in security escorting her out of

---

[5] There was another referral on January 4, 2013, also apparently arising from the probate case, alleging emotional abuse and general neglect by mother and neglect by father. After investigation, the allegations of emotional abuse were deemed unfounded and the allegations of general neglect deemed inconclusive.

the meeting room. In light of these actions, DCFS remained concerned about mother's mental health stability, even though mother claimed to have continued taking her medication.

The meeting resulted in DCFS detaining C.M. because, although C.M. was not at current risk of abuse or neglect with her paternal grandparents, neither mother nor father was suitable to provide care for C.M. at that time. As for father, his visits were to remain monitored by the paternal grandparents. Even though he had completed a drug program, parenting course, and hair follicle drug tests, he admitted he was not ready to provide care for C.M. on his own. Mother's visits also remained monitored as ordered by the probate court, even though she completed a parenting course and submitted to hair follicle tests. DCFS noted mother tested positive for marijuana in October 2012. Both mother and father agreed C.M. could be placed with the paternal grandparents while DCFS filed a petition.

The court held the detention hearing on January 15, 2013. Mother expressed her desire to have "as much visitation as possible. It seems that the probate matter has drug on for around two years now, and mother has not always been able to arrange visitation with the paternal grandparents. Mother reports that they're not very supportive of reunification and often changed the visitation schedule. So we're just asking for specific visitation orders." DCFS indicated it was important that the court order monitored visitation for mother and that father not monitor those visits.

The court detained C.M. from mother and released her to father's custody on the condition he reside with the paternal grandparents and continue to drug test "clean." The court ordered mother and father to stay at least 100 yards away from one another; they were also to have no contact in any way, including by electronic means such as email and text message. Both were ordered to participate in random drug testing and mother would be provided with no or low cost referrals to a drug program. Mother was awarded no less than four hours of visitation a week and father was ordered not to monitor mother's visits.

## 2. *Amended Petition and Section 385 Application*

DCFS filed an amended petition on February 25, 2013, adding count b-3 alleging father had a 15-year history of methamphetamine abuse, currently abused alcohol, and had a recent toxicology screening indicating diluted results, all of which put C.M.'s physical health and safety at risk. In the detention report, the investigator explained father initially denied any knowledge of the diluted test result, but then admitted he had been drinking "a few beers while working on [his] house." He did not realize the toxicology screening included alcohol and he did not want to test positive for it. The paternal grandmother expressed willingness to care for C.M. and to monitor father's visits with her. The report indicated mother continued to have visitation one time per week monitored by DCFS staff.

Based on the same diluted test result, DCFS also filed a section 385 application to modify the existing court order releasing C.M. to father with family maintenance services. It recommended C.M. be removed from father's care and placed with her paternal grandmother.[6]

At a February 25, 2013 hearing on the amended petition and the section 385 request, the court dismissed the original section 300 petition in favor of the amended petition and granted the section 385 petition, detaining C.M. from father and ordering her placed with the paternal grandmother. At the hearing, mother complained the paternal grandparents have allowed her to have "barely . . . two hours of visits per week." As a result, the court ordered that parents were to have weekly monitored visits for a minimum of four hours.

## 3. *Jurisdiction/Disposition Report and Hearing*

In preparation for the combined jurisdiction/disposition hearing set for March 4, 2013, an investigator met with C.M., who was very active, running, jumping, sitting in a chair independently, playing with toys, and throwing a ball. She said "hi" and "bye"

---

[6]  Because the paternal grandfather had arrests from 1966 and 1967, he had moved out of the home until DCFS could obtain a criminal waiver.

and the paternal grandmother reported she could say a few other words. She did not display any emotional or behavioral issues.

Mother was interviewed, during which she paced and wrung her hands to the point they were red, and she did not make eye contact with the investigator. Regarding the allegations of substance abuse, she once again admitted she tested positive for marijuana when C.M. was born, but she had a "card" so she believed she was using it legally to help with her moods. She denied smoking it daily. She admitted "[m]ethamphetamine is in [her] history" and she took it and other prescription drugs without a prescription. She had an ADHD[7] diagnosis and was "experimenting." She was in a two-year program for "co-occurring" diagnoses, and she moved to Orange County in 2006, where she completed a program through "Prop 36." She was in a 90-day inpatient program and a sober living program. She claimed to have taken Adderall "[f]rom time to time," but denied using "street drugs." She sometimes went to meetings, but not often lately because she would go for hikes or ride her bike to get natural adrenaline to keep her "very balanced." She stated she and father used methamphetamine "from time to time" during their relationship.

Mother further explained she had a bipolar diagnosis, which was first diagnosed when she was 17 years old, and again when she was 22, at which point she was given medication. She was also diagnosed with posttraumatic stress disorder stemming from a childhood molestation. She had psychotic episodes when she was a teenager through her early 20's and she was hospitalized, but she claimed it had not happened recently. She got into the habit of taking her medication while she lived in Orange County, and identified several different medications she was taking currently. She said she had a couple of upcoming therapy and psychiatric appointments.

She claimed the paternal grandparents took C.M. from her. When father was arrested in May 2011, the paternal grandparents lied to her and said he was away on a business trip, at which point they detained C.M. Mother could not do anything

---

[7]    Attention Deficit Hyperactivity Disorder.

because she did not have a custody decree. When the court released C.M. to father's custody, mother did not understand why. She claimed the paternal grandmother had an "unhealthy attachment" to C.M. and she had made false allegations against mother based on text messages mother sent to father. She said father got "kind of abusive" to her while she was pregnant. She had not been taking medication while she was pregnant and experienced a "crash of emotions" after C.M. was born, prompting her to "vent[]" in text messages. She admitted sending text messages like "Die baby, die," but claimed she was only repeating things father said to her while she was pregnant. She also admitted sending text messages to father and attempting to speak with him after the court issued the no-contact order, but father did not respond. The report attached approximately 25 pages of text messages and calls from mother between March 2011 and January 2013.

Mother also claimed the paternal grandparents and father "did some kind of family abduction." Because they would not answer the phone, mother and a friend named Paula drove by the paternal grandparents' house and saw them leave with C.M. Mother followed them and called the police, but because father was with C.M., the police took no action. Mother confronted them in the lobby of a hotel at a casino and they would not let her see C.M.

Father told the investigator he and mother met when they were both using drugs. He did not think she was using drugs much during her pregnancy, but he was not sure. He said she would not take the follicle tests after a while because they were too expensive. He stopped speaking with her when the no-contact order was issued, but she continued to contact him. He admitted to multiple substance abuse arrests, but indicated he attends alcoholics anonymous and narcotics anonymous meetings and has been able to abstain from using drugs by focusing on his relationship with C.M. But in DCFS's view, he had not demonstrated a long period of stability or that he was willing and able to care for C.M., which put C.M. at risk of future abuse and neglect.

With regard to the allegations of mother's mental and emotional problems, father said, "I had never seen any of [mother's] mental health issues because they

didn't come out until after [C.M.] was born. Did you see the text messages? She said horrible things." He said he received a phone call from a 323 area code the previous week and he thought it was his boss. But it was mother, and when he called the number back, he reached the inpatient mental health department at Kaiser Permanente. Even though they were supposed to have no contact in light of the court's order, mother texted him four hours after court adjourned and had since sent him about 75 text messages. One time he went to his house and she was there, but she took off when he called the police. He also learned at some point she had found a note on his front door containing the phone number of his high school friend, and she began calling him. Father "can't begin to understand why." In his opinion, mother "has problems."

The paternal grandparents were also interviewed. The paternal grandmother did not know much about mother's drug history but "suspect[s] she's using when she gets this dark look in her eyes. It's a hateful, ugly look. She sweats profusely, all the way through her blouse. She will go a few weeks where she appears OK, but that ends and she's back to having issues, again." The paternal grandfather knew father had been taking hair follicle tests, but when he offered to pay for mother to take those tests, she shaved her head.

The paternal grandmother explained she did not know when mother would "go off on these episodes." Mother told her she has psychotic breaks and, according to the paternal grandmother, "[s]he's obviously suicidal." She mentioned the museum incident when mother became "belligerent" and began screaming at her. Moreover, earlier on the day of the interview mother was supposed to visit C.M., but she got "out of control" and the social worker had to cancel the visit. The paternal grandmother explained she went to probate court after the incident of mother following them to the hotel at the casino, during which mother made a "horrible scene." She did not think anything would help mother.

The paternal grandfather reported mother had told him she had been put on a hospital hold before. He had received phone calls from a 323 area code and when he

called the number, he reached the inpatient facility at Kaiser Permanente, which made him think mother was there. Mother did things that did not "make any sense," such as visiting C.M. with him monitoring and then posting messages on Facebook calling him a "faggot, pedophile grandfather." He said, "I'm tired of this. We went to [probate] [c]ourt to protect [C.M.] It's not what I thought I would be doing at this point in my life."

Mother's friend Paula was interviewed and said she was with mother during her pregnancy. She claimed father was "very abusive to her," including calling her "old and decrepit" in the delivery room. Paula said mother had no postpartum depression and was a great mother; she was just "really stressed out." When mother said she was going to pick up C.M. after the paternal grandmother took her, the paternal grandmother said "no." Paula was with mother when she followed the paternal grandparents, father, and C.M. to the hotel at the casino; she observed the paternal grandparents take C.M. to the hotel room and father block mother so she could not get to her. According to Paula, "[i]t was really traumatic."

Also attached to the DCFS report were the results of psychological testing of mother. Most of the results were rendered invalid by her unwillingness to fully reveal herself and her attempts to present herself favorably, but the evaluating doctor was able to conclude she had average self-esteem and self-confidence, she had a low probability of having a substance abuse disorder, and she would not likely overreact or be unduly harsh with children in her care. Another test suggested mother was conscientious, orderly, efficient, dependable, industrious, and persistent, although those results could have been caused by an individual who was interested in looking good in a testing situation.

DCFS reported mother had a monitored visit with C.M. on February 7, 2013, during which mother became very aggressive toward the paternal grandmother, claiming the paternal grandparents had "stolen" C.M. The social worker intervened and determined the visit should not proceed as planned. Mother began yelling and was asked to leave. The social worker escorted mother out, reminding her to have no

13

contact with the paternal family. Mother became increasingly upset and said she should just "give up the fight" because the paternal grandparents "want my baby and no one is listening to me." The social worker called for an ambulance because mother was so upset, but mother quickly walked away before it could arrive, stating she did not want to go to the hospital. The social worker recommended mother receive immediate counseling. A week later, mother was able to visit C.M. without the paternal grandparents present because the social worker arranged transportation for C.M. to avoid contact between mother and the paternal grandparents.

The DCFS report also included two declarations from mother, along with numerous attachments, which largely recounted the facts described in the DCFS report. In the first declaration, she explained father urged her to have an abortion and, if she did not, the paternal grandmother would attempt to take C.M. and otherwise "cause problems." Mother's medical records indicated her methamphetamine use was in remission and she stated she did not use methamphetamines during her pregnancy due to concern for C.M.'s welfare. She also did not take any prescribed medications during pregnancy because she feared possible birth defects. She claimed that, while she was in the delivery room, father said she was "too old and decrepit" to have a baby and he hoped she would become incontinent and have "zebra-stripe stretch marks" all over her body. The paternal grandmother was there and silently condoned father's remarks. After C.M. was born, father refused to be supportive in any way.

After mother took C.M. home, father and the paternal grandparents took C.M. with the maternal grandmother's consent, assuring her they would return C.M. the next day. A day and a half later, mother and father agreed to take care of C.M. together at father's home. When father was arrested in May 2011, the paternal grandparents lied to mother about what happened. When father was released from jail, he became irate and threatened that the paternal grandparents would take C.M. and mother would not see her again. Mother recounted calling the sheriff's department, which could not assist her, and she described the incident when she followed father and the paternal grandparents to the hotel at the casino to recover C.M.

14

Mother's second declaration focused on alleged failures by the probate court and the DCFS and her fitness as a parent based on her parenting classes, counseling, drug testing and treatment, and psychological evaluations. For example, she completed a parenting class in January 2012; completed a 30-day individual counseling course in December 2011; participated in a chemical dependency treatment program at Kaiser Permanente between March and May 2012; and completed a five-month alcohol prevention and treatment and group therapy program in September 2011. As of June 2011, she was compliant with her medications and showed improvement. The juvenile court also received a letter indicating mother would attend a four-week intensive outpatient program in March 2013. She tested negative for drugs in July and September 2011, and May and June 2012.

On this record, DCFS concluded mother's erratic behavior did not appear to be under control. Although clearly she loved her daughter, "her mental health issues have not yet adequately been addressed at this time, and she had not been able to demonstrate she is emotionally stable at this time." DCFS also noted she had an "extensive substance abuse history." Although she did not use "street drugs," she admitted illegally using prescription medication, despite having completed a full treatment program. She did not have an appropriate plan for sobriety and admitted to occasional use. She also admitted using drugs to help her balance her mental health issues. Her mental health issues compounded with her substance abuse issues would require an extensive amount of work, attention, and support, and she would need "extensive support and help prior to releasing [C.M.] to her care."

DCFS was concerned with father's "conflicting perspectives" between his expressed desire to care for C.M. and his statements he was not ready to care for her on his own. Because father had not demonstrated a long period of stability or that he was willing and able to care for C.M., his "seeming ambivalence" about her care put her at risk of future abuse and neglect with him.

DCFS recommended C.M. be declared a dependent of the court and detained. It recommended mother receive an Evidence Code section 730 evaluation and

15

participate in "Parents Beyond Conflict," weekly random and on-demand drug testing, a substance abuse treatment program, and Narcotics Anonymous and Alcoholics Anonymous meetings. It recommended father receive family maintenance services and participate in weekly random and on-demand drug testing, an outpatient substance abuse treatment program, Narcotics Anonymous and Alcoholics Anonymous meetings, individual therapy, and Parents Beyond Conflict. It further recommended mother have monitored visitation.

DCFS submitted a supplemental report for the March 4, 2013 hearing focused on the allegations of drug and alcohol abuse by father. The report noted father had regular visits with C.M. for more than four hours a week, which have been monitored by the paternal grandmother. Mother also had a four-hour visit with C.M. on C.M.'s birthday, which went well. However, on the same day the paternal grandmother reported that neighbors told her two women in a car took photographs of her house on February 26, 2013, and she believed they were mother and the maternal grandmother. After his diluted test results, father tested negative for drugs and alcohol. Mother failed to randomly drug test on February 8, 2013, but when the investigator reminded her to do so, she said she would. DCFS concluded that, although father reported he was prepared to care for C.M., C.M. remained at risk because father indicated he continued to consume alcohol regularly while leaving C.M. with her paternal grandparents and his position on caring for C.M. has "flip-flopped." Thus, DCFS reiterated its recommendations in its initial report, but recommended both father and mother have monitored visitation. C.M. remained temporarily detained with her paternal grandmother.

At the contested jurisdiction/disposition hearing on March 4, 2013, mother pled no contest for jurisdictional purposes to count b-1 related to her substance use. With certain modifications, the court found that count true as follows: "The child [C.M.]'s mother, Tammi A[.], has a history of methamphetamine use, and is a current user of marijuana, which renders the mother incapable of providing regular care for the child. The mother used marijuana during the mother's pregnancy with the child. On

10/24/2012, the mother had a positive toxicology screen for marijuana. On prior occasions in 2012, the mother was under the influence of marijuana while the child was in the mother's care and supervision. The mother's substance use endangers the child's physical health and places the child at risk of harm."

The court dismissed count b-2 related to mother's mental and emotional problems, finding an insufficient nexus had been shown. The court dismissed count b-3 related to father's alcohol and substance abuse because insufficient evidence had been presented.

The court proceeded immediately to disposition, declaring C.M. a dependent of the court and finding clear and convincing evidence there was a substantial danger to C.M.'s physical and emotional health and well-being if C.M. were returned to mother's physical custody, and there was no reasonable means to ensure her safety without removing her from mother's custody. Despite the record indicating C.M. did not reside with mother, the court ordered "[C.M.] removed from [mother], a parent with whom she was residing at the time the petition was filed." Over objection by the DCFS, the court ordered C.M. released to father on the condition he and C.M. reside with the paternal grandparents. The court ordered father to participate in family maintenance services, random drug testing, and a drug treatment program if he missed any tests or tested "dirty." The court ordered that mother undergo a psychiatric evaluation, take prescribed medication, and participate in random weekly drug testing, parenting classes, and individual counseling. She was given monitored visitation with C.M. with DCFS discretion to liberalize. The court set the next hearing pursuant to section 364. Mother timely appealed.

## DISCUSSION

### 1. Removal Pursuant to Section 361, Subdivision (c)

All the parties and the juvenile court assumed section 361, subdivision (c)(1) governed the disposition in this case. Section 361, subdivision (c)(1) provides in relevant part, "A dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the

17

petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parents or guardian's physical custody. . . ."

We asked the parties to file supplemental briefs[8] on whether the juvenile court erred in applying section 361, subdivision (c) because C.M. was not in mother's physical custody and was not residing with her at the time the initial section 300 petition was initiated on January 15, 2013. Both parties conceded C.M. was not living with mother at the time the petition was filed, but both took the position that section 361, subdivision (c) should be interpreted to include legal custody or other custodial rights even in the absence of actual physical custody, and C.M.'s parents retained custodial rights when the probate court terminated the paternal grandparents' temporary legal guardianship in August 2011.

We cannot accept this interpretation. Whatever parental rights might be included in the term "custody" when that term is used in the Welfare and Institutions Code without qualification (see, e.g., *In re Austin P.* (2004) 118 Cal.App.4th 1124, 1130 [discussing the meaning of "custody" in § 361.2, subd. (a)]), or even in the term "physical custody" as used in section 361, subdivision (c), that provision expressly governs removal of a child from the physical custody of a parent *with whom the child resides at the time the petition was initiated.* C.M. did not reside with mother on January 15, 2013, the date the petition was initiated, so section 361, subdivision (c) did not apply. Although mother contends this interpretation creates an ambiguity in the juvenile dependency law when parents have full legal and physical custodial rights to a child who does not live with them, that ambiguity was not created by law, but by mother herself. Assuming she had the right to have C.M. reside with her, she did not

---

[8]     We grant mother's request to file her supplemental brief one day late.

enforce that right, as she conceded in her supplemental brief. As a result, the juvenile court's dispositional order did not meet the conditions for section 361, subdivision (c) to apply.

Because the juvenile court's dispositional order limited mother's control of C.M., it was governed by section 361, subdivision (a)(1),[9] which states in pertinent part, "In all cases in which a minor is adjudged a dependent child of the court on the ground that the minor is a person described by Section 300, the court may limit the control to be exercised over the dependent child by any parent or guardian and shall by its order clearly and specifically set forth all those limitations. . . . The limitations may not exceed those necessary to protect the child. . . ." This provision allows the court to "limit the control of the parent over the dependent child" (*Teresa J. v. Superior Court* (2002) 102 Cal.App.4th 366, 375) and enables the juvenile court to make orders in the child's best interest (see *id.* at pp. 375-376).

Although the juvenile court erred in applying section 361, subdivision (c), that error was harmless because sufficient evidence would have readily supported the juvenile court's order under the best interests standard in section 361, subdivision

---

[9] While mother suggested in a footnote in her opening brief that section 361.2, subdivision (a) might apply, she conceded in her supplemental brief it does not. DCFS agreed, as do we. Section 361.2, subdivision (a) states, "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." Section 361.2 "comes into play *after* a child has been removed from the physical custody of his or her parents under section 361, subdivision (c)." (*In re A.A.* (2012) 203 Cal.App.4th 597, 608.) Here there was no such removal because, as discussed above, C.M. was not in mother's physical custody, and the juvenile court dismissed the allegations against father and ordered C.M. to be released to him on the condition he reside with the paternal grandparents.

(a).**10**  "In reviewing the sufficiency of the evidence on appeal we consider the entire record to determine whether substantial evidence supports the court's findings. [Citation.]  We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence.  Rather, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if other evidence supports a contrary finding.  [Citations.]"  (*In re James R.* (2009) 176 Cal.App.4th 129, 134-135 (*James R.*).)

Mother admitted she had a history of methamphetamine use, she had taken other prescription drugs without a prescription, she used marijuana while pregnant with C.M., and C.M. tested positive for marijuana at birth.  Mother also tested positive for marijuana in October 2012, and the October 26, 2012 upfront assessment noted mother denied having a substance abuse problem and suggested she was minimizing her substance abuse, recommending she be subject to further drug testing.  In February 2013 mother also failed to randomly drug test.  While she demonstrated commendable progress toward addressing those drug use issues, mother's substance use supported placing C.M. with father on the condition he reside with the paternal grandparents in order to serve her best interests.

Further, while the juvenile court dismissed the allegations related to mother's mental and emotional issues, the court could have nevertheless considered mother's pattern of mental and emotional problems to determine whether limiting mother's control over C.M. was in C.M.'s best interests.  Mother had gone off her medication for bipolar disorder when she found out she was pregnant and admitted father did not allow her to have unsupervised visits with C.M. because there had been a "post partum incident" after she was born and mother had been texting father "a lot of crazy stuff," which father confirmed.  Those texts included mother writing "I can't wait to stick this

---

**10**      We reject the DCFS's argument that mother forfeited her challenge to C.M.'s removal by not objecting to the sufficiency of the evidence in the juvenile court. (*In re Javier G.* (2006) 137 Cal.App.4th 453, 464; *In re Brian P.* (2002) 99 Cal.App.4th 616, 623.)

needle in me deep . . ." and "Die baby, die." In fact, mother's issues were serious enough that, two days after C.M. was born, father and the paternal grandparents took C.M. from her and the maternal grandmother. And when father was arrested in May 2011, father gave C.M. to her paternal grandparents with the maternal grandmother's consent, where C.M. continued to reside.

After C.M. went to live with her paternal grandparents, mother's pattern of mental and emotional issues continued. For example, at the trip to the museum, mother "had an outburst" and became "belligerent" toward and screamed at the paternal grandmother.

During the January 2013 team decisionmaking meeting, mother exhibited erratic behavior by speaking loudly, twisting in her chair, and standing up in an aggressive way, all of which resulted in security escorting her out.

At her interview for the jurisdiction/disposition report, mother paced, wrung her hands to the point they were red, and did not make eye contact with the investigator. She admitted having a bipolar diagnosis and posttraumatic stress disorder stemming from a childhood molestation and she said she had not been taking medication while she was pregnant. She experienced a "crash of emotions" after C.M. was born, prompting her to "vent[]" in text messages, which she continued to send to father after the juvenile court's no-contact order.

At one point, mother followed the paternal grandparents and confronted them in a hotel at a casino. The paternal grandmother described it as a "horrible scene" and mother's friend Paula described it as "really traumatic."

Father also reported he received phone calls and text messages from mother and called the police once when he arrived at his house and found her there. He also reported mother began calling father's high school friend after finding his number on a note on father's front door. He couldn't "begin to understand why," and in his opinion, mother "has problems."

The paternal grandmother explained she did not know when mother would "go off on these episodes." Mother told her she has psychotic breaks and, according to the

paternal grandmother, "[s]he's obviously suicidal." In addition to the museum incident, the paternal grandmother reported that, earlier on the day of her interview for the jurisdiction/disposition report, mother was supposed to visit C.M., but she got "out of control" and the social worker had to cancel the visit.

The paternal grandfather reported mother had told him she had been put on a hospital hold before and mother did things that did not "make any sense," such as visiting C.M. with him monitoring and then posting messages on Facebook calling him a "faggot, pedophile grandfather."

This erratic behavior continued at a monitored visit with C.M. on February 7, 2013, when mother became very aggressive toward the paternal grandmother, so much so that the social worker had to intervene and end the visit. Outside, mother became increasingly upset, prompting the social worker to call for an ambulance, but mother quickly walked away before it could arrive, stating she did not want to go to the hospital. The social worker recommended mother receive immediate counseling.

In light of these incidents, DCFS concluded mother's erratic behavior did not appear to be under control and "her mental health issues have not yet adequately been addressed at this time, and she had not been able to demonstrate she is emotionally stable at this time." Her mental health issues compounded with her substance abuse issues would require an extensive amount of work, attention, and support, and she would need "extensive support and help prior to releasing [C.M.] to her care."

In arguing the record did not support the juvenile court's order, mother cites *James R.* and *In re David M.* (2005) 134 Cal.App.4th 822, but both cases are distinguishable because they addressed whether substantial evidence supported the juvenile court's jurisdictional finding of a risk of physical harm under section 300, not whether substantial evidence supported limits to a parent's control in the best interests of the child under section 361, subdivision (a). (See *James R., supra*, 176 Cal.App.4th at p. 134; *David M., supra*, at p. 829.) They also involved different facts. In *James R.*, although the mother had a history of mental instability and substance abuse, there was no evidence of past abuse or neglect and the risk of future harm was speculative.

(*James R., supra*, at pp. 136-137.)  Likewise, in *David M.*, although the mother used marijuana at least once during pregnancy and delayed prenatal care, her child tested negative for drugs at birth and showed no signs of drug withdrawal.  (*David M., supra*, at p. 829.)  The mother also continued to use marijuana, but there was no evidence her drug use caused or would cause a risk of substantial harm to her children.  (*Id.* at p. 830.)  And the social services agency relied on an outdated report without conducting an independent investigation into the current allegations.  (*Id.* at p. 831.)  Here, by contrast, C.M. was born testing positive for marijuana, mother continued to use marijuana, and mother's mental issues repeatedly manifested themselves, including while she was on a supervised visit with C.M.

Mother also cites *In re Alexis E.* (2009) 171 Cal.App.4th 438, another section 300 case, for the proposition that the "the mere use of marijuana by a parent will not support a finding of risk to minors."  (*Id.* at p. 452.)  The court in *Alexis E.* nevertheless found this principle inapplicable to the facts before it because the father did more than simply use medical marijuana; he previously used it illegally, he used it while his children were home, and his use had a negative effect on his demeanor toward the children, all of which created a risk of harm to the children.  (*Id.* at pp. 451-453.)  Similarly here, there was more evidence than just mother's alleged medical marijuana use to demonstrate a risk of harm to C.M., as we have discussed above.

In sum, the record of mother's substance use and mental and emotional issues sufficiently supported an order placing C.M. with father on the condition he reside with the paternal grandparents in order to serve C.M.'s best interests.

## 2. *Placement with Father on Condition He Reside with Paternal Grandparents*

Mother challenges the juvenile court's order placing C.M. with father on the condition he reside with the paternal grandparents, arguing the acrimony between her and the paternal grandparents will undermine her visitation and reunification services.  DCFS has taken no position on this issue on appeal.  "'The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order in accordance with this discretion.'  [Citation.]  The

23

reviewing court will not reverse the court's order in the absence of a clear abuse of discretion. [Citation.]" (*In re Gabriel L.* (2009) 172 Cal.App.4th 644, 652.) We find no abuse of discretion here.

Father had a history of drug use, including his drug arrest in May 2011, and made conflicting statements about wanting C.M. to be returned to him but doubting whether he could adequately care for her on his own, which supported the juvenile court's decision not to simply release C.M. to his care without conditions. C.M. had been living with her paternal grandparents almost since she was born and thrived with them, appearing appropriately groomed, happy, comfortable, and free of obvious marks or bruises. At the interview for the jurisdiction/disposition report, she was very active, running, jumping, sitting in a chair independently, playing with toys, throwing a ball, and saying a few words. She did not display any emotional or behavioral issues. Whatever acrimony existed between mother and the paternal grandparents, the juvenile court reasonably concluded that C.M.'s placement with father on the condition he reside with the paternal grandparents was the best option for her. If the situation between mother and the grandparents becomes an actual obstacle to mother's reunification with C.M., the juvenile court can address that issue in future hearings. (§ 364, subd. (a); Cal. Rules of Court, rule 5.706(a).)

### 3. *Prohibition of Father Monitoring Mother's Visits*

Mother also challenges the juvenile court's order prohibiting father from monitoring mother's visits, arguing it will negatively impact her efforts "toward amicably co-parenting C.M. and runs contrary to the goal of resuming normal family relationships." We review the juvenile court's visitation order for abuse of discretion (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356), and find no abuse of discretion here.

The juvenile court appropriately balanced mother's interests in visitation with C.M.'s best interests and exercised its discretion to impose "conditions or requirements to further define the right to visitation in light of the particular circumstances of the case before it." (*In re Jennifer G.* (1990) 221 Cal.App.3d 752,

24

757.)  Only a few days after C.M. was born, mother sent father text messages that were so concerning that he and the paternal grandparents removed C.M. from her care. Mother's erratic behavior so eroded her relationship with father that, in January 2013, the juvenile court ordered mother and father to have no contact and to stay 100 yards away from each other, which mother violated four hours after court adjourned and violated again when she showed up at father's house, requiring father to call the police.  The jurisdiction/disposition report also attached pages of mother's disturbing text messages.  In light of this evidence, and the lack of evidence to suggest mother's visitation and reunification with C.M. would be compromised in any way without father's supervision at visits, the juvenile court appropriately determined father should not monitor mother's visits.

## DISPOSITION

The juvenile court's dispositional order is affirmed.




FLIER, J.

WE CONCUR:



BIGELOW, P. J.



RUBIN, J.